In re Nancy G. MAYNE, Rama Belagaje, Paul J. Burnett and Hansen M. Hsiung.

No. 95–1522.

United States Court of Appeals, Federal Circuit.

Jan. 17, 1997.

Paul J. Gaylo, Eli Lilly and Company, Indianapolis, IN, argued, for appellants. With him on the brief, were John E. Parrish and Edward P. Gray. Of counsel was Paul R. Cantrell.

Scott A. Chambers, Associate Solicitor, U.S. Patent and Trademark Office, Arlington, VA, argued, for the Commissioner. With him on the brief, were Nancy J. Linck,

Solicitor, Albin F. Drost, Deputy Solicitor, and Richard Torczon, Associate Solicitor.

Before ARCHER, Chief Judge, MICHEL and RADER, Circuit Judges.

RADER, Circuit Judge.

The Patent and Trademark Office Board of Patent Appeals and Interferences (Board) affirmed the rejection of claims 30 and 31 of patent application 07/686,016 as obvious under 35 U.S.C. § 103 (1994). The Board also rejected applicants' attempt to rebut the prima facie case of obviousness with evidence of unexpected properties. Because the applicants merely substituted one element known in the art for a known equivalent, this court affirms.

### Background

The patent application at issue in this case relates to the field of protein engineering. Initially, biotechnology was used to create large quantities of a known, pharmaceutically significant protein in its pure form. However, advances in genetic engineering now allow protein engineers to dissect and reassemble segments of known proteins to create new and useful proteins.

Proteins are large polymeric molecules made up of individual amino acids linked by peptide bonds to form a peptide chain. One end of a peptide chain ends in an amino group (NH2) and the other ends in a carboxyl group (COOH). Although there are only twenty common amino acids, each distinguishable by its side chain, they produce innumerable potential polypeptide sequences. In turn, these polypeptide sequences relate to a virtually infinite number of possible protein structures.

Each amino acid in the protein sequence plays a role in defining the structure of the protein. Depending on its composition and resulting polarity or nonpolarity, the side chain is either hydrophobic or hydrophilic. Each amino acid interacts with adjacent amino acids dependent upon their polarity. This interaction, along with the rotational flexibility of the polypeptide chain, is a key component in the definition of the conformation and three-dimensional structure of the protein.

Once a protein is developed, it often has a specific application in biotechnology. For example, the development of recombinant bovine somatotrophin made possible the administration of this protein to dairy cows in order to increase milk production. One possible side effect of the introduction of engineered proteins into living organisms is the stimulation of an immune response. A triggered immune response can have numerous effects, ranging from blocking the efficacy of the protein to adverse health consequences to the organism.

Applicants claim two compounds made with recombinant DNA technology. These compounds are proteins each comprising the amino acid Met, an enterokinase cleavage site, and either human or bovine growth hormone (HGH or BGH). Met necessarily results from translation of RNA into proteins. The enterokinase cleavage site is an amino acid sequence (peptide chain) in the form Asp–Asp–Asp–Asp–Lys ($(Asp)_4$–Lys). Enterokinase recognizes the sequence $(Asp)_4$–Lys as the point at which to cleave the initial peptide chain (between Lys and either the HGH or the BGH) to produce a mature protein. The HGH and BGH are well known proteins in the prior art.

Thus, the claims on appeal require Met–Phe–Pro–Leu–$(Asp)_4$–Lys–HGH and Met–Phe–Pro–Leu–$(Asp)_4$–Lys–BGH. Hybrid proteins in the form of the claimed compounds are known as fusion proteins because different parts of the protein are coded by the DNA of different genes. Moreover, in this case, two of the amino acids in the cleavage site between the Met and $(Asp)_4$– namely, Phe and Leu—are hydrophobic.

The Board relied on three primary prior art references in determining obviousness. First, Rutter, U.S. Patent No. 4,749,326 (Rutter), teaches recombinant DNA technology to fuse an enzyme cleavage site to a desired protein, in this case the HGH or BGH. The second reference, Light, et al., *Analytical Biochemistry* 106: 199–206 (1980) (Light), teaches the uses of enterokinase to identify the cleavage site. Light also teaches two naturally occurring forms of the enterokinase recognition sequences, which begin

with Phe–Pro–Ile and Leu–Pro–Leu. Finally, Goeddel, et al., *Nature* 281: 544–48 (1979) (Goeddel), discloses the nucleotide and amino acid sequences of HGH and BGH. Applicants claim that their compounds viewed as a whole are not prima facie obvious because the cited references provide insufficient motivation to combine.

Applicants argue in the alternative that even if a prima facie case of obviousness is made, two unexpected results establish the nonobviousness of the compounds. First, they argue it is unexpected that the proteins would induce such a low immune response when administered by injection to rats. Second, they argue it is unexpected that the proteins would be biologically active even before cleavage of the initial peptide chain.

Applicants rely on four references to rebut obviousness. First, U.S. Patent No. 4,703,-004 (the '004 patent), discloses immune responses to certain peptides. Second, J.T. Barrett, *Textbook of Immunology* 12–83 (3d ed. 1978) (Barrett) describes expected immunogenic responses to similar compounds. Third, Juskevich, et al., *Science* 249: 875–84 (1990) (Juskevich), discusses biological activity of bovine growth hormone. Finally, Bick, et al., *Animal Biotechnology* 1: 61–71 (1990) (Bick), describes the immune response of dairy cattle to introduced proteins. Applicants urge that each of these references establish that the claimed compounds exhibit unexpected properties.

After evaluation of the evidence, the Board was not convinced: "Since the [applicants] have merely substituted one functional equivalent for another, we concur with the examiner that a fusion protein comprising the enterokinase cleavage site, Phe–Pro–Leu–(Asp)$_4$–Lys, would have been prima facie obvious to one skilled in the art at the time the present application was filed." Moreover, the Board stated that the applicants "failed to establish that those skilled in the art would have considered" the results unexpected.

## Discussion

Section 103(a) precludes the grant of a patent "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the art." 35 U.S.C. § 103(a). Although reviewing the ultimate question of obviousness as a question of law, this court reviews the foundational facts for that conclusion for clear error. *Dennison Mfg. Co. v. Panduit Corp.*, 475 U.S. 809, 810–11, 106 S.Ct. 1578, 1579, 89 L.Ed.2d 817 ("While the ultimate question of patent validity is one of law ... the § 103 condition [that is, nonobviousness] ... lends itself to several basic factual inquiries." (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545, 148 USPQ 459, 466–67 (1966))); *In re Deuel*, 51 F.3d 1552, 1557, 34 USPQ2d 1210, 1214 (Fed.Cir.1995) (citing *In re Vaeck*, 947 F.2d 488, 493, 20 USPQ2d 1438, 1442 (Fed.Cir.1991)); *In re Beattie*, 974 F.2d 1309, 1311, 24 USPQ2d 1040, 1041 (Fed. Cir.1992).

The legal determination under section 103 is whether the claimed invention as a whole would have been obvious to a person of ordinary skill in the art at the time the invention was made. *In re O'Farrell*, 853 F.2d 894, 902, 7 USPQ2d 1673, 1680 (Fed. Cir.1988). The foundational facts for the prima facie case of obviousness are: (1) the scope and content of the prior art; (2) the difference between the prior art and the claimed invention; and (3) the level of ordinary skill in the art. *Graham v. John Deere Co.*, 383 U.S. at 17–18, 86 S.Ct. at 693–94; *Miles Labs., Inc. v. Shandon Inc.*, 997 F.2d 870, 877, 27 USPQ2d 1123, 1128 (Fed.Cir. 1993). Moreover, objective indicia such as commercial success and long felt need are relevant to the determination of obviousness. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538, 218 USPQ 871, 878–79 (Fed.Cir. 1983). Thus, each obviousness determination rests on its own facts. *In re Durden*, 763 F.2d 1406, 1410, 226 USPQ 359, 361 (Fed.Cir. 1985).

## Prima Facie Obviousness

The Patent and Trademark Office (PTO) has the burden of showing a prima facie case of obviousness. *In re Bell*, 991 F.2d 781, 783, 26 USPQ2d 1529, 1530 (Fed.

Cir.1993); *see In re Fine,* 837 F.2d 1071, 1074, 5 USPQ2d 1596, 1598 (Fed.Cir.1988). Standards for the patenting of chemical entities have evolved. At one time, the PTO focused only on the "structural obviousness" of the chemical entity. Under this standard, the structural formula of the claimed compound was compared for similarity with the structural formulae of known compounds. This regime did not allow evidence of unexpected results to trump the conclusion of obviousness based on structure. Over thirty years ago, courts recognized that unexpected properties can show that a claimed compound that appeared to be obvious on structural grounds was not obvious when looked at as a whole. *See, e.g., In re Papesch,* 50 C.C.P.A. 1084, 315 F.2d 381, 391, 137 USPQ 43, 51 (1963). In *In re Dillon,* 919 F.2d 688, 16 USPQ2d 1897 (Fed.Cir.1990) (en banc), this court noted the effect of unexpected results in the obviousness determination for chemical entities, but rejected as a requirement for establishing prima facie obviousness that there be an expectation or suggestion in the prior art that the claimed compound will have similar utility as the one newly discovered by applicant. The court held that "structural similarity between claimed and prior art subject matter, proved by combining references or otherwise, where the prior art gives reason or motivation to make the claimed compositions, creates a prima facie case of obviousness." *Id.* 919 F.2d at 692. When relying on numerous references or a modification of prior art, it is incumbent upon the examiner to identify some suggestion to combine references or make the modification. *In re Jones,* 958 F.2d 347, 351, 21 USPQ2d 1941, 1943 (Fed.Cir.1992) (stating that there must be some suggestion to combine, "either in the references themselves or in the knowledge generally available to one of ordinary skill in the art"); *see Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.,* 776 F.2d 281, 292, 227 USPQ 657, 664 (Fed.Cir.1985).

■ When the PTO shows prima facie obviousness, the burden then shifts to the applicant to rebut. *Dillon,* 919 F.2d at 692. Rebuttal may take the form of "a comparison

of test data showing that the claimed compositions possess unexpectedly improved properties ... that the prior art does not have, that the prior art is so deficient that there is no motivation to make what might otherwise appear to be obvious changes, or any other argument ... that is pertinent." *Id.* at 692–93 (citations omitted).

■ To show prima facie obviousness, the Board relied on Rutter and Light in view of Goeddel. Rutter teaches the creation of fusion proteins, which are later cleaved to obtain a desired protein. In this process, Rutter further notes that certain peptide sequences serve well as cleavage sites because they are recognized by enterokinase. Then, Rutter and Light both identify cleavage sequences recognized by enterokinase, specifically "X–(Asp)$_n$–Lys–Y" where Y is the desired protein. Rutter further teaches a way to improve enterokinase recognition by using four Asp amino acids (n = 4) in the combination X–(Asp)$_4$–Lys–Y.

These references would teach one of ordinary skill in recombinant DNA arts to use an enterokinase cleavage site for release of the familiar compounds HGH and BGH. As a result, fusion proteins of the form X–(Asp)$_4$–Lys–HGH or X–(Asp)$_4$–Lys–BGH would be obvious. Thus, the prior art provides ample motivation to create fusion proteins in the forms X–(Asp)$_4$–Lys–(HGH or BGH).

Applicants' claimed invention merely substitutes the tripeptide Phe–Pro–Leu as X in the obvious formula to arrive at the structure Phe–Pro–Leu–(Asp)$_4$–Lys–Y. Applicants' specification aptly describes the multitude of peptides taught by Light in the X position of the fusion protein formula:

Enterokinase appears to cleave a peptide at the carboxyl of a lysine (Lys) residue that is preceded by a multiplicity of acidic amino acids, i.e., glutamic acid (Glu) and/or aspartic acid (Asp). Thus, in [Light], a number of amino acid sequences recognized by enterokinase are described, including many of the following:

Phe-Pro-Leu-Asp-Asp-Asp-Asp-Lys *;

---

* While the applicants' own specification states that Light discloses the claimed compound "Phe–

Pro–Leu–Asp–Asp–Asp–Lys," this appears to be an error. Because Light does not directly

Val-Asp-Asp-Asp-Asp-Lys;

Phe-Pro-Ile-Glu-Glu-Asp-Lys;

Leu-Pro-Leu-Glu-Asp-Asp-Lys;

Ala-Asp-Asp-Lys;

Asp-Asp-Asp-Asp-Lys.

Light teaches the cleavage sites:

(1) Phe-Pro-Ile-Glu-Glu-Asp-Lys;

(2) Leu-Pro-Leu-Glu-Asp-Asp-Lys; and

(3) Val-Asp-Asp-Asp-Asp-Lys.

Light at 199. In addition, Rutter discloses "that Glu or a combination of Asp and Glu can be substituted for Asp." Thus, Light and Rutter reveal Phe–Pro–Ile and Leu–Pro–Leu may serve as X in the basic formula. Light at 199. Both are strikingly close to the applicants' claimed Phe–Pro–Leu.

A comparison of Phe–Pro–Ile and Leu–Pro–Leu in the prior art with the claimed Phe–Pro–Leu suggests structural similarity. Structural relationships often provide the requisite motivation to modify known compounds to obtain new compounds. *In re Deuel,* 51 F.3d at 1558. In fact, Leu is an isomer of Ile—an identical chemical formula with differences only in the chemical bonding of the atoms. The side chains, also known as R-groups, of Leu and Ile have the same number of hydrogen and carbon atoms. Both are nonpolar, hydrophobic amino acids. The structure of Leu and Ile alone suggest their functional equivalency.

Moreover, two of the activation sequences revealed by Light have either an Ile or a Leu at the third position. Light, too, suggests substitution of Leu for Ile at that third position of the activation sequence. In view of Light and the similarities between Leu and Ile, Phe–Pro–Leu–(Asp)$_4$–Lys–Y is an obvious functional equivalent to enterokinase recognition sequences disclosed in the prior art. This court detects no error in the PTO's prima facie obviousness case.

### Unexpected Results

■ With a factual foundation for its prima facie case of obviousness shown, the burden shifts to applicants to demonstrate that their claimed fusion proteins possess an unexpected property over the prior art. *In re Soni,* 54 F.3d 746, 750, 34 USPQ2d 1684, 1687 (Fed.Cir.1995). An applicant may make this showing with evidence that the claimed invention exhibits some superior property or advantage that a person of ordinary skill in the relevant art would find surprising or unexpected. *Id.*

> The basic principle behind this rule is straight forward—that which would have been surprising to a person of ordinary skill in a particular art would not have been obvious. The principle applies most often to the less predictable fields, such as chemistry, where minor changes in a product or process may yield substantially different results.

*Id.* An examination for unexpected results is a factual, evidentiary inquiry, which this court reviews for clear error. *See In re Johnson,* 747 F.2d 1456, 1460, 223 USPQ 1260, 1263 (Fed.Cir.1984).

Applicants allege that claim 30, and claim 31 by analogy, have two unexpected results. First, they argue it is unexpected that the proteins would induce so low an immune response when administered by injection. Second, they argue it is unexpected that the proteins would be biologically active before cleavage of the initial peptide chain.

To show that low immunogenicity was unexpected, applicants rely on a number of references, including Juskevich, Bick, Barrett, and the '004 patent. However, these references do not establish clear error. For example, Bick, contrary to applicants' assertion, suggests that the claimed protein, ninety-five percent of which occurs naturally within dairy cattle, would not elicit a strong immune response. The '004 patent contains the sequence Asp–Tyr–Lys, a sequence not present in the claimed compound. In addition, whether the '004 patent measured the intensity of the immune response can only be inferred. Moreover, none of these references nor the specification of the patent has comparative test data that shows low immunogenicity of the claimed compound com-

disclose the compound, neither this court nor the Board merely accepts applicants' specification as an admission of anticipation.

pared to similar fused proteins of the formula X–(Asp)$_4$–Lys–BGH. In fact, while identifying a number of different amino acid sequences recognized by enterokinase, applicants' specification provides no comparative data on immunogenicity of these sequences. Without such comparative data, applicants' argument is wholly based on inferences drawn from the prior art as to how a different protein would be expected to produce results based on responses not measured.

Specifically, the '004 patent does indicate that hydrophilic amino acids, *e.g.,* Asp and Lys, and aromatic amino acids, *e.g.,* Phe, can create high *specificity* when added to a protein. This reference, however, discloses a laboratory protein purification process that is concerned with *specificity* in order to insure that the desired protein is separated from other proteins without the antibodies recognizing additional antigens. In this case, the applicants point to the low *intensity* of the immune response in the claimed compound as an unexpected result. Specificity is not always commensurate with the intensity of a response. Moreover, Barrett states that "terminal substitutes [like Phe–Pro–Leu] often exert a controlling influence on the *specificity* of antibodies." (Emphasis added.) Barrett does not establish the relative immunogenicity of the claimed amino acid sequences.

Bick, also cited by applicants, is not controlling. Bick notes that applicants' compounds produce a low immune response in dairy cattle. Bick however compared applicants' product to "conventional foreign substances," without noting whether "conventional foreign substances" were self-proteins with small peptides attached (as in the claimed compounds) or foreign proteins. In fact, Bick even suggests that the dairy cattle should not mount a strong response because they "should recognize the recombinant product as similar to 'self.' "

In addition to arguments relating to unexpected immunogenicity, applicants insist that biological activity before cleavage makes the invention nonobvious. The specification demonstrates the biological activity of the product by a study involving its use in rats. The Board dismissed this, stating "the speci-

fication fails to explain the significance, or the applicability, of the data." Moreover, applicants have made no attempt to show that BGH or HGH would be expected to be biologically inactive when fused to similar, recognized enterokinase cleavage sites. Applicants' conclusory statement that biological activity would not be expected fails to carry its burden. Even were it obvious to a practitioner of the art, applicants have the burden to provide the PTO with evidence showing that such is the case.

*AFFIRMED.*